**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

REUBEN E. WRIGHT,

Petitioner,

v. Case No. 8:26-cv-1676-WFJ-LSG

SECRETARY, DEPARTMENT OF CORRECTIONS,

Respondent.
_____________________________________/

# ORDER

Petitioner Reuben E. Wright, a Florida prisoner, initiated this action by filing a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 10). Petitioner submitted a reply. (Doc. 13). After careful review, the petition is **DENIED**.

## I. Background

On the morning of March 8, 2016, Glenda McCray picked up her son Zachary from his home in Lakeland, Florida, and drove him "to a job interview." (Doc. 12-1, Ex. 6, at 26-29). Zachary[1] lived in a duplex with his girlfriend, Unique Young. (*Id.* at 27). Petitioner's girlfriend resided in the adjoining apartment. (*Id.* at 28). When Ms. McCray returned with Zachary that morning, Petitioner and Ms. Young were standing outside. (*Id.* at 30-31). Zachary "got out of [the] car" and joined Petitioner and Ms. Young. (*Id.* at 35-

[1] To avoid confusion, the Court refers to Zachary McCray by his first name. No disrespect is intended.

36). Ms. McCray remained in her truck with "a clear line of sight" to "their faces and their bodies." (*Id.* at 36). The "sun was out," and it "was a very clear day." (*Id.* at 30).

As she sat in her truck, Ms. McCray observed a "calm conversation"; nobody was "arguing," "screaming," or "fussing." (*Id.* at 37). Zachary had "both of his hands" in his pockets, and Petitioner had one hand in his pocket. (*Id.*) When the conversation ended, Petitioner "started walking toward" the truck "as if he was going to leave." (*Id.* at 38). Instead of leaving, Petitioner "turned around," walked "back toward" Zachary and Ms. Young, and began "shooting a gun." (*Id.* at 38-39). As Zachary ran "to dodge the bullets," Petitioner walked toward "the adjoining apartment," "following [Zachary] with the gun, just shooting." (*Id.* at 39). Zachary tried to "jump [a] fence" but "fell over" after being shot in the knee. (*Id.*) Ms. McCray heard "about five gunshots," after which Petitioner "calmly . . . walked into the adjoining apartment." (*Id.* at 40).

Ms. McCray called 911 and drove Zachary to Lakeland Regional Hospital, where he received treatment for gunshot wounds to his head, left arm, and legs. (*Id.* at 41-42, 102-05). Zachary ultimately underwent surgery to remove a "bullet" from his head as well as broken skull "fragments." (*Id.* at 118-21). He stayed in the hospital for approximately "three weeks" and subsequently needed Ms. McCray's assistance with "[p]retty much everything," including eating and bathing. (*Id.* at 53-54). Shortly after Zachary was admitted to the hospital, law enforcement showed Ms. McCray a single photograph of Petitioner. (*Id.* at 89-91, 99). Ms. McCray "immediately" said, "That's him," and was "100 percent confident" that he was the shooter. (*Id.* at 94, 99-100).

Two days after the shooting, law enforcement located Petitioner at the Luau Motel in Lakeland. (*Id.* at 141-42). From his position behind the motel, Officer Chad Whitaker heard other officers "banging on the door" and talking at the room's front entrance. (*Id.* at 123, 126-27). Soon after, Officer Whitaker saw a backpack "dropped" from the bathroom window, followed by Petitioner attempting to climb out while "holding a pistol." (*Id.* at 127-28, 160). Petitioner "spotted" Officer Whitaker, whereupon he "went right back into the window," taking the pistol "with him." (*Id.* at 128). Petitioner ultimately "agreed to come out" of the room and was arrested. (*Id.* at 193). The backpack was "embroidered" with the name "Reuben," and officers found a .380 caliber handgun inside a basketball in the room's closet. (*Id.* at 160, 164-65). A firearms analyst subsequently determined that the three cartridge cases recovered from the crime scene had been fired from the .380 caliber handgun. (*Id.* at 80-82, 265, 272).

Petitioner was charged with attempted first-degree murder and possession of a firearm by a felon. (*Id.*, Ex. 3). The case went to trial on the attempted-first-degree-murder count, and Petitioner was found guilty as charged. (*Id.*, Ex. 5). Because he qualified as a prison releasee reoffender, Petitioner received a mandatory sentence of life imprisonment. (*Id.*, Ex. 6, at 368). The State subsequently *nolle prossed* the felon-in-possession charge. (*Id.*, Ex. 26, at 3).

Petitioner's conviction was affirmed on direct appeal in an unexplained decision. (*Id.*, Ex. 14). Petitioner then moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 18). The postconviction court summarily denied two claims; it rejected the rest after an evidentiary hearing. (*Id.*, Exs. 21, 22, 25, 26). The appellate court

affirmed without explanation. (*Id.*, Ex. 32). This federal habeas petition followed. (Doc. 1).

## II. Standards of Review

### A. AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Petitioner's case affirmed his conviction, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

**B. Exhaustion of State Remedies; Procedural Default**

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The

exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

**C. Ineffective Assistance of Counsel**

Petitioner alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of

professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Petitioner must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion

### A. Ground One—Sufficiency of the Evidence

Petitioner argues that the evidence at trial was "insufficient to establish [the] premeditation necessary for attempted first-degree murder." (Doc. 1 at 5). Petitioner moved for a judgment of acquittal on this basis, and the trial court denied the motion without explanation. (Doc. 12-1, Ex. 6, at 274-75). Petitioner challenged this ruling on direct appeal, arguing that "[t]he evidence presented by the State was insufficient to show a premeditated design . . . to effect the death of the victim." (*Id.*, Ex. 12, at 20). The appellate court disagreed, affirming in an unexplained decision. (*Id.*, Ex. 14). Where, as here, "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. For the reasons explained below, Petitioner cannot satisfy his burden.

Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. This standard does not require the prosecution "to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.* The *Jackson* standard "is

equally applicable to direct or circumstantial evidence." *Martin v. State of Alabama*, 730 F.2d 721, 725 (11th Cir. 1984).

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Petitioner is not entitled to relief because a reasonable jurist could conclude that the evidence was sufficient to establish premeditation. Under Florida law, "premeditation is an essential element of attempted first-degree murder." *Deal v. State*, 359 So. 2d 43, 44 (Fla. 2d DCA 1978). "Premeditation is a fully formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit reflection." *Yinger v. State*, 409 So. 3d 201, 204 (Fla. 1st DCA 2025). "Premeditation can be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." *Easterling v. State*, 410 So. 3d 750, 752 (Fla. 1st DCA 2025). Typically, premeditation is "a question of fact for the jury." *Asay v. State*, 580 So. 2d 610, 612 (Fla. 1991).

The trial evidence supported a finding of premeditation. As she sat in her truck outside the duplex, Ms. McCray had "a clear line of sight" to the participants' "faces and . . . bodies." (Doc. 12-1, Ex. 6, at 36). She observed a "calm conversation" between Petitioner, Zachary, and Ms. Young, with no "arguing" or "screaming." (*Id.* at 37). After the conversation ended, Petitioner "started walking toward" the truck "as if he was going

to leave." (*Id.* at 38). Instead, Petitioner "turned around," walked "back toward" Zachary and Ms. Young, and began "shooting a gun." (*Id.* at 38-39). As Zachary ran "to dodge the bullets," Petitioner walked toward "the adjoining apartment," "following [Zachary] with the gun, just shooting." (*Id.* at 39). Zachary tried to "jump [a] fence" but "fell over" after being shot in the knee. (*Id.*) Ms. McCray heard "about five gunshots," after which Petitioner "calmly . . . walked into the adjoining apartment." (*Id.* at 40).

Viewed in the light most favorable to the prosecution, this sequence of events would permit a rational jury to find "a fully formed conscious purpose to kill." *Yinger*, 409 So. 3d at 204. After the "calm conversation" ended, Petitioner began to walk away, then "turned around" and started shooting at Zachary. (Doc. 12-1, Ex. 6, at 37-39). A rational jury could infer from Petitioner's departure and return that he decided to kill Zachary with enough time "to be conscious of the nature of the act he [was] about to commit and the probable result of that act." *Easterling*, 410 So. 3d at 752. This inference is supported by Petitioner's conduct during the shooting. As Zachary tried to flee, Petitioner tracked him "with the gun" and kept "shooting." (Doc. 12-1, Ex. 6, at 39). By keeping the gun aimed at Zachary, Petitioner showed a continuing effort to strike the victim. Indeed, Petitioner fired approximately five times at Zachary, hitting him in the head, left arm, and legs. (*Id.* at 40, 102-05). A rational jury could infer that Petitioner was carrying out the purpose to kill he had formed earlier in the encounter. *See Washington v. State*, 432 So. 2d 44, 47 (Fla. 1983) ("[T]estimony showing that the shooting was intentional, along with the fact that appellant shot the [victim] four times, is sufficient evidence to support the jury's verdict that the murder was committed with premeditation."); *Morales v. State*, 170 So. 3d 63, 66-67 (Fla.

1st DCA 2015) (finding "sufficient evidence of premeditation" where defendant exited a car after a verbal exchange and fired repeatedly at the victim).

Because a reasonable jurist could agree with the rejection of the sufficiency challenge, Petitioner is not entitled to relief.

### B. Ground Two—Failure to Seek Suppression of Ms. McCray's Identifications

Petitioner argues that trial counsel provided ineffective assistance by failing to move to suppress Ms. McCray's identifications of him as the shooter. (Doc. 1 at 7-8). According to Petitioner, Ms. McCray's "out-of-court identification was tainted and unreliable" because law enforcement "showed her a single booking photo" and she failed to provide an accurate description of the suspect. (*Id.* at 7). Petitioner also asserts that counsel should have moved to suppress Ms. McCray's "in-court identification" because it "was predicated upon" the allegedly unreliable "out-of-court identification." (*Id.*)

Respondent correctly contends that this claim is unexhausted and procedurally defaulted. (Doc. 10 at 21-22). In his Rule 3.850 motion, Petitioner argued that counsel "should have moved to exclude" Ms. McCray's identifications because they were "tainted and unreliable." (Doc. 12-1, Ex. 18, at 5-13). The postconviction court summarily rejected this claim for lack of "prejudice." (*Id.*, Ex. 22, at 6-7). It summarily denied one other claim and set the rest for an evidentiary hearing. (*Id.* at 9; Doc. 12-1, Ex. 24). After the hearing, the court denied the remaining claims in a written order. (*Id.*, Exs. 25, 26).

In Florida state court, "[w]hen at least one postconviction claim is resolved after an evidentiary hearing, an appellant must brief all claims he wishes the appellate court to

review, including those claims denied without a hearing." *Holloman v. Sec'y, Dep't of Corr.*, No. 8:19-cv-2953-CEH-SPF, 2023 WL 2570048, at *4 (M.D. Fla. Mar. 20, 2023). On appeal from the denial of his Rule 3.850 motion, Petitioner did not challenge the rejection of his claim concerning counsel's failure to seek suppression of the identifications. (Doc. 12-1, Ex. 29). Instead, he raised only one issue on appeal: whether the postconviction court erred in rejecting his claim that "counsel performed ineffectively by failing to properly advise [him] [regarding] the State's plea offer." (*Id.* at 9). Thus, Petitioner failed to properly exhaust Ground Two. *See Atwater v. Crosby*, 451 F.3d 799, 809-10 (11th Cir. 2006) (explaining that under Florida law, "abandonment of an issue results from submission of a brief without argument thereon in an appeal of an order denying relief after an evidentiary hearing").

Petitioner cannot return to state court to exhaust his ineffective-assistance claim because Florida law does not allow for a second appeal from the denial of a Rule 3.850 motion. *See* Fla. R. App. P. 9.141(b). Therefore, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Because Petitioner presents no cognizable basis to excuse the default, Ground Two is barred from federal habeas review.[2]

[2] In his reply, Petitioner appears to contend that the default should be excused because his postconviction appellate attorney was ineffective for failing to raise Ground Two on appeal. (Doc. 13 at 2). This argument is meritless. Under *Martinez v. Ryan*, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, *in the initial-review collateral proceeding*, . . . counsel . . . was ineffective." 566 U.S. 1, 17 (2012) (emphasis added). But the *Martinez* exception "does not extend

Even if Ground Two were properly exhausted, Petitioner would not be entitled to relief because the ineffective-assistance claim fails on the merits. Specifically, Petitioner cannot show *Strickland* prejudice because his proposed suppression motion would have failed. *See Castillo v. United States*, 816 F.3d 1300, 1303 (11th Cir. 2016) (noting that "a defendant is not prejudiced by counsel's failure to" file a meritless suppression motion).

The constitution imposes "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006). Thus, even if an identification procedure was unduly suggestive, exclusion is not required if, "under the totality of the circumstances, the identification was nonetheless reliable." *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).

---

to attorney errors made in appeals from initial-review collateral proceedings." *Baker v. Dep't of Corr., Sec'y*, 634 F. App'x 689, 693 (11th Cir. 2015). Therefore, counsel's failure to raise Ground Two on appeal from the Rule 3.850 denial cannot excuse the default. *See Lambrix v. Sec'y, Fla. Dep't Corrs.*, 756 F.3d 1246, 1260 (11th Cir. 2014) ("[T]he *Martinez* rule is expressly limited to attorney errors in initial-review collateral proceedings: '[T]he holding in [*Martinez*] does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.'" (quoting *Martinez*, 566 U.S. at 16)).

Even assuming the identification procedure in this case was unduly suggestive, Petitioner's proposed suppression motion would have failed because Ms. McCray's identification "was nonetheless reliable." *Id.* "Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of certainty; and (5) length of time between the [encounter] and the identification." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Ms. McCray had an adequate "opportunity to view" the shooter both before and during the offense. *Id.* The shooting took place during daylight hours on "a very clear day," and Ms. McCray had "a clear line of sight" to the participants' "faces and . . . bodies." (Doc. 12-1, Ex. 6, at 30, 36). Indeed, she testified that she could see "everything and everybody" through her car window. (*Id.* at 52). From this vantage point, Ms. McCray witnessed the conversation outside the residence, saw Petitioner begin to walk away toward her truck, and then observed him turn back and fire at Zachary. (*Id.* at 37-39). These conditions gave Ms. McCray ample opportunity to view the suspect. *See Williams v. Warden*, 814 F. App'x 477, 480 (11th Cir. 2020) (finding that witness had "ample opportunity to view" suspect because encounter took place "during daylight hours" and lasted "three to four minutes").

Ms. McCray also paid sufficient attention to the shooter. She testified that she remained outside the duplex "for a few minutes" because she was concerned about Zachary, explaining that she "felt [it] would be best to wait until" Petitioner left. (Doc. 12-1, Ex. 6, at 35-38). Moreover, in her testimony, she distinguished the participants' "body

language" and hand positions; she also described Petitioner's initial departure, his turn back, and his firing a gun as Zachary attempted to escape. (*Id.* at 37-39). Ms. McCray's sustained attention during the encounter weighs in favor of the reliability of her identification. *See O'Brien v. Wainwright*, 738 F.2d 1139, 1141 (11th Cir. 1984) (upholding admission of identification where witness "focused his attention solely on the actions of the burglar").

Furthermore, Ms. McCray displayed a high "level of certainty" when she identified Petitioner as the perpetrator, and the identification occurred only hours after the shooting. *Diaz*, 248 F.3d at 1102. As explained above, Ms. McCray drove Zachary directly to the hospital from the crime scene. (Doc. 12-1, Ex. 6, at 41-42). Shortly after Zachary was admitted to the hospital, law enforcement showed Ms. McCray a single photograph of Petitioner. (*Id.* at 89-91, 99; *see also* Doc. 12-1, Ex. 18, at 12). Ms. McCray "immediately" said, "That's him," and was "100 percent confident" that he was the shooter. (Doc. 12-1, Ex. 6, at 94, 99-100). The certainty and promptness of the identification weigh in favor of its reliability. *See Manson v. Brathwaite*, 432 U.S. 98, 115 (1977) (witness's assurance that there was "no question whatsoever" about the identification supported reliability despite use of a single "photograph"); *Simmons v. United States*, 390 U.S. 377, 385 (1968) (finding "little chance that the procedure utilized led to misidentification" where, among other things, "witnesses were shown the photographs only a day later, while their memories were still fresh").

Lastly, any alleged defects in Ms. McCray's description of the shooter are insufficient to overcome the other indicia of reliability. Petitioner notes that Ms. McCray

failed to mention "any of the tattoos" on his "neck" and "arms." (Doc. 1 at 7). But Ms. McCray testified that she "wasn't looking for any tattoos," and she provided other details about the shooter's appearance, including that he was "light-skinned," had "a short haircut," and wore "red shorts," a "white shirt," and "black tennis shoes."[3] (Doc. 10-2, Ex. 6, at 59-61). Because the other factors uniformly weigh in favor of reliability, Ms. McCray's failure to mention the tattoos is not enough to render the identification inadmissible. *See United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) ("[I]n the face of the other factors indicating that [the eyewitness's] identification was reliable, her failure to notice whether the robber had tattooed hands is insignificant."); *Nelson v. Sec'y, Dep't of Corr.*, No. 8:14-cv-1257-CEH-JSS, 2017 WL 4297247, at *4 (M.D. Fla. Sept. 28, 2017) (witness's "fail[ure] to note [suspect's] gold teeth and tattoos" was insufficient to warrant exclusion of identification because other "factors" supported reliability).

Because the proposed suppression motion is meritless, no prejudice ensued from counsel's failure to pursue it.[4] *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (no prejudice from counsel's failure to challenge eyewitness identifications because "any challenge to their admissibility would not have succeeded").

## IV. Conclusion

Accordingly, the Court **ORDERS**:

---

[3] In his § 2254 petition, Petitioner does not identify any inaccuracy in Ms. McCray's description of the shooter's skin tone, haircut, or clothes. (Doc. 1 at 7-8).

[4] Because Ms. McCray's out-of-court identification was reliable, any contention that it tainted her subsequent in-court identification necessarily fails. *See Manson*, 432 U.S. at 110 n.10 ("[I]f the challenged identification is reliable, then testimony as to it and any identification in its wake is admissible.").

1. Petitioner's petition for writ of habeas corpus (Doc. 1) is **DENIED**.
2. The **CLERK** is directed to enter judgment against Petitioner and to **CLOSE** this case.
3. Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Petitioner must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner has not made the requisite showing. Because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on November 3, 2026.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**